CLEMENT *v.* CROSBY & CO.

1. NEGLIGENCE—DANGEROUS COMPOUNDS—TORTS—EXPLOSIVES.

Negligence in placing on the market a compound for blacking stoves, without a label or notice of its dangerous character, may be inferred from evidence that it was about two-thirds naphtha and exploded while the plaintiff was applying the compound.[1]

2. SAME—PROXIMATE CAUSE.

The fact that the plaintiff testified that she turned off the gas, and that no fire or flame was left on the stove to cause the explosion, would not preclude a recovery, if the jury believed that such a flame caused the explosion.

3. TRIAL—PRACTICE—SPECIAL FINDINGS.

Special questions as to the manner in which the explosion was caused were not proper to submit to the jury where they were inconclusive of the right to recover.

4. NEGLIGENCE—EXPLOSIVE AND DANGEROUS COMPOUNDS—CAUSE.

The plaintiff was not bound to aver or prove what caused the compound to ignite.

5. TRIAL—ARGUMENT OF COUNSEL.

Improper argument of plaintiff's attorney, to the effect that demurrer after demurrer had been interposed and difficulty experienced because of appeals, etc., was not prejudicial where the plaintiff was badly burned, and recovered a verdict of $1,500.

Error to Wayne; Hosmer, J. Submitted April 28, 1909. (Docket No. 107.) Decided July 15, 1909.

Case by Alice D. Clement against Crosby & Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Affirmed.

*Alex J. Groesbeck* and *Edwin H. Henderson,* for appellant.

*James H. Pound,* for appellee.

[1] As to liability of manufacturer to person injured by article dangerous to life, in the absence of any privity of contract, see note to *Watson* v. *Augusta Brewing Co.* (Ga.), 1 L. R. A. (N. S.) 1178.

Plaintiff was putting stove polish or enamel upon her gas range with a brush, when, in some way, it ignited, and she was severely burned. She brought her action for damages against both the manufacturer of the compound and the merchant who sold it to her. An order overruling the demurrer of the manufacturer to the declaration was affirmed. *Clement* v. *Crosby & Co.*, 148 Mich. 293 (111 N. W. 745, 10 L. R. A. [N. S.] 588). An order sustaining the demurrer of the merchant was affirmed. *Clement* v. *Rommeck*, 149 Mich. 595 (113 N. W. 286, 13 L. R. A. [N. S.] 382, 119 Am. St. Rep. 695). A reference to the opinions of this court in these cases will discover the nature of the alleged duties of the defendants. Later plaintiff filed an amended declaration, in which Crosby & Co. is made sole defendant, which contains the added averment that the sale was in violation of Act No. 181, Pub. Acts 1899. The testimony on the part of the plaintiff tended to prove that the composition was some pigment, probably carbons, and volatile matter consisting almost entirely of naphtha.. The volatile matter was 66 per cent. of the whole. It was volatile at an ordinary temperature, produced vapor, and that vapor, mixed with air, is explosive. She had no notice, knowledge, or warning of the dangerous nature of the preparation. As to the manner in which the injury occurred, she testified: That, having applied the polish to the top and to three sides of the range, she was on her knees by the side of the range applying the polish with a brush. That the brush seemed to "flame right up."

"*Q.* Was there any flame, or what was the first thing that you discovered about it?

"*A.* Why, the flame. * * * I don't know when it lighted. I don't know if I went to put it back near the can or not; but the first thing I was all burning, my hair and clothes.

"*Q.* You were burning, and how about what you had on; was the range itself, was that on fire?

"*A.* Yes, it was burning all over the top of the stove, burning all over.

"*Q.* Did the can itself burn, or not?

"*A.* Oh, yes, the can went right up to the ceiling. It flamed right up. * * *

"*Q.* And you claimed it was from the friction ?

"*A.* Yes, sir.

"*Q.* There was no flame anywhere near it ?

"*A.* No, sir.

"*Q.* No red hot iron ?

"*A.* No, sir.

"*Q.* There was no iron perceptibly hot ? All you claim for it, it was warm ?

"*A.* Yes, sir; the whole of that side of the stove was warm. I had covered about half of that stove when I noticed the brush ignite. Up to that time I had not noticed that the heat of the stove had caused any flame or burning, nor was there any odor. I used the brush the same as I would in painting the floor, just spread it on. I used just enough pressure to spread on the enamel, the same as I done all over the stove. * * *

"*Q.* There was a little flame at first came from the brush ?

"*A.* Yes, sir.

"*Q.* Then what did it do, spread ?

"*A.* I don't remember whether I went and put the brush back near the can; but the next thing I was all in flame. * * *

"*Q.* As a matter of fact, Mrs. Clement, you do not know how you caught afire, do you, yourself ?

"*A.* I don't know. It was the polish that ignited me. * * *

"*Q.* As near as you can get to it, and what you want us to understand, is that the friction of the brush on the stove itself caught fire ?

"*A.* Yes, sir.

"*Q.* Now, as a. matter of fact, and is it not true this stove was lit ?

"*A.* No, sir.

"*Q.* And that you got the brush and the enamel close to the flame ?

"*A.* No, sir.

"*Q.* And in that way ignited it ?

"*A.* No, sir; there was no flame near the enamel, and the stove was not lit, and there was no flame there, and the brush became ignited by friction.

"*Q.* Is there any chance of your being mistaken on that ?

"*A.* No, sir; there is not the slightest. There was not sufficient heat on that part of the stove to even cause smoke up to the time I saw the flame, and there was no odor or any evidence of burning whatever; but suddenly there was a flame."

The plaintiff introduced the testimony of two chemists, one of whom made an examination of the compound known as 6–5–4 in the fall of 1906, and determined approximately the constituent parts in it. He testified: That naphtha will not ignite if rubbed on a piece of iron on a brush; that anything raised above a low red heat or lighted match or a flame would ignite it; that if there was no fire in the stove it would not catch fire; that mere friction on an ordinary stove with a brush would not ignite it. The other chemist testified that brushing the compound on the side of a cold stove would not ignite it, and he did not think it would ignite if it was a warm stove. It appears that certain tests were made during the progress of the trial in the basement of the building in which court was held, in which a can of the compound known as 6–5–4 was used, of some of the results of which experiment one of the witnesses for the plaintiff, recalled, testified that it required a naked flame to ignite it.

"*Q.* You saw what we did down there this morning?

"*A.* Yes, sir.

"*Q.* Took a red hot iron and painted it on with a brush?

"*A.* Yes, sir.

"*Q.* And it did not ignite?

"*A.* No.

"*Q.* And you saw a flame held over it within two inches of it for a considerable length of time and it would not ignite?

"*A.* Finally it ignited after it had a chance to volatilize.

"*Q.* It was held and waved back and forth until it got close enough to light, or ignite?

"*A.* About an inch and a half.

"*Q.* And that was quite a flame like on a torch?

"*A.* Yes, sir.

"*Q.* A pretty good sized flame?

"*A.* Well, that is immaterial, a match would ignite it the same distance.

"*Q.* Well, the flame is not as large?

"*A.* It does not matter.

"*Q.* Well, it was a good sized torch flame?

"*A.* It would ignite more readily; it would volatilize a little more readily on account of the heat from the torch.

"*Q.* How long do you think you could wave that torch a distance of four inches from that without lighting it?

"*A.* It depends upon the temperature.

"*Q.* Take the temperature such as we have in this room, 72?

"*A.* I don't know how readily it would volatilize, I never tried it.

"*Q.* It depends upon the temperature of the room, and the proximity of the flame to it?

"*A.* Yes, sir.

"*Q.* But it is volatile considering its constituent elements?

"*A.* Yes, sir.

"*Q.* Pure naphtha will volatilize more quickly than that mixture as this is?

"*A.* Yes, sir."

The testimony for defendant tended to prove that the composition or enamel had been manufactured for several years, that the manufacturer regarded it as safe, had never heard of its exploding, or that it would ignite from the friction caused by spreading it on iron with a brush —that it would not ignite unless in contact with a flame. A distributor of the product for the manufacturer testified to sales of 10,000 cans in a period of three years without having heard a complaint. A motion to direct a verdict for defendant was denied; the court saying:

" I think I will let it go to the jury on the question of whether the composition which is substantially two-thirds naphtha is, or is not, a dangerous article, or ought to be sold upon the market.

" *Mr. Henderson:* They have cut out of the declaration that which would allow us to show that she was guilty of contributory negligence.

"*The Court:* I don't care what the declaration is, I will decide that it should go to the jury on that theory. I will

let it go to the jury upon whether its character ought to have been expressed upon the box. The only way you can rid of it is by the verdict of the jury or a decision of the Supreme Court. If she knew from the smell of it that naphtha was one of its constituent parts, and the jury find that the proximate cause of the injury was her own carelessness, that is the end of this case. If I had opened that box, or you had opened that box, I think either one of us would have recognized the fumes of naphtha. I think the jury are warranted from the testimony in finding that there was flame around there somewhere.

"*Mr. Henderson:* Supposing she had stepped on a match and set fire to her dress, and then set fire to this, we would not be liable. * * *

"*The Court:* Well, I am going to let it go to the jury. * * * The theory on which I let it go to the jury is the question of whether it was negligence to put up an article which was composed of two-thirds naphtha, because the evidence is that about two-thirds of it was naphtha, without making upon the box something to indicate the presence of such a product. That is the substance of the theory, and whether the fact that that was not marked on the box was really the efficient cause of the accident."

The jury were instructed:

"That by the common law, itself, the unwritten law of this land, it is essential that a manufacturer who puts up an article which is liable to cause injury to the ignorant must of necessity put upon his package proper information of the danger which is to be apprehended by the party who uses the article, and if you find in this case, gentlemen of the jury, that the article in question was liable, when mixed with air, to explode or to ignite under circumstances which would become a menace to those ignorant of its properties, then I charge you, gentlemen of the jury, that it was the duty of the manufacturer of the article to put a proper and sufficient warning as to its contents upon the can. Now, there are some of us, gentlemen of the jury, I think, on opening of that can, would have been aware of its contents. Those who have used naphtha for any purpose, doubtless, have recognized the odor of naphtha, or known that it was one of the lighter constituents of crude petroleum, and perhaps, gentlemen, we might not have used the article in such a manner as to produce an injury; but unless you find in this case,

gentlemen of the jury, that the plaintiff had, or ought to have had, that knowledge, then unquestionably, if she was injured in the innocent use of the article, in the manner in which the counsel has claimed in this case, under those circumstances, gentlemen, she would be entitled to recover such damages as would compensate her for the injuries which she has sustained. Now I do not mean to say, from what I have said, that the accident occurred in the manner in which she has detailed, because, I think, I would be intruding upon your province, if I did. It is possible that you should find in this case, gentlemen of the jury, that the explosion may have come from a leakage in the can itself, and that that was the proximate cause of the injury. It is possible, gentlemen of the jury, that you may disbelieve the testimony of the plaintiff as to the method of the injury, and so, gentlemen of the jury, find that the defendant is not responsible in any way for the damage which occurred; but I think it belongs to you, from the evidence which has been adduced before you, to say, if in your judgment you see fit, that she was injured by reason of the fact that no warning was given of the nature of the contents of the package—that is, of the dangerous nature—I may say, if you find it to be dangerous, of the contents of the package, and you may find that, without negligence on her part, she was injured in the manner in which she has detailed. * * * If the defendant be liable for negligence, and it occurs either from friction, or, as I say—you have heard the testimony that it could not occur in that way—or from the striking of a match, or from the gas which still remained lit upon the stove, then I say to you, no matter if it occurred in those ways, if you find that the sale of the article without proper warning was the proximate cause of the injury, and she did not contribute thereto, whether it occurred in any of these ways, still the defendant would be liable."

Errors are assigned upon the instructions so given. Errors are assigned upon the conduct of the attorney for plaintiff and upon statements made by him to and in the presence of the jury. Three special questions, viz. :

"*First.* Was there any ignition of the compound known as 6–5–4 by friction or through spontaneous combustion, at the time plaintiff alleges she was injured? If so, which?

"*Second.* Was the compound 6–5–4, while being used in the manner described by plaintiff in her testimony, ignited by friction?

"*Third.* Does the jury know how the compound 6–5–4 was ignited when being used by plaintiff at the time she claims she was injured?"—were framed by counsel for defendant.

"*The Court:* I am asked to submit three special questions to the jury. I think they are inclusive, and refuse them for that reason. Note an exception."

Counsel for defendant presented requests to charge, which were refused; the sixth and seventh of them being:

"(6) I charge you in this case that there is no evidence, except that given by Mrs. Clement and her sister, Mrs. Hawkins, as to how the accident occurred. Mrs. Hawkins testified that previous to washing the dishes she went to the gas stove for the purpose of turning off the gas because she found the water hot enough. When she examined the stove, she found that the gas had already been turned off and positively swore that there was no flame. Mrs. Clement, the plaintiff, has testified: That she turned off the gas before using the enamel or compound 6–5–4. That after turning off the gas she opened the can and then proceeded to spread a portion of the contents on the stove, covering two or three sides before there was any difficulty. That the stove was not even hot. That she purposely refrained from spreading the mixture on that part of the stove closest to which the fire had been, in order to give it a chance to cool. That while spreading the mixture or compound she did not notice any heat. Both she and her sister were positive in their statements regarding it. That while spreading the mixture or enamel in this manner, through friction, there was a fire or flame or explosion. That the contents of the can that she was holding in her hand burst into a flame that reached either to or near the ceiling of the room. Unless you believe this testimony of the plaintiff and her sister, I charge you that your verdict must be for the defendant.

"(7) I charge you that the theory of the plaintiff in this case, as evidenced by her testimony and that of her sister, the only persons present and in the house when the accident occurred on the date in question, is that while using the compound or mixture 6–5–4 on a stove which was not red hot, that it, the mixture, or compound, ignited or ex-

ploded and caused her to be burned. If you find that this theory is not sustained by the proofs in this case by a fair preponderance of the evidence, then your verdict shall be for the defendant, ' No cause of action.' "

And errors are assigned upon the refusal of the court to give the same.

OSTRANDER, J. (*after stating the facts*). There was testimony which warranted the jury in finding that it was negligent for defendant to place upon the market for sale, for common domestic use, the particular compound or composition, without notifying the public, by a proper label or otherwise, of its dangerous character. The applicable rule of law is sufficiently stated in the opinion in *Clement* v. *Crosby & Co.*, 148 Mich. 293, 296, 297 (111 N. W. 745, 10 L. R. A. [N. S.] 588).

The single meritorious question remaining, affecting the right to a recovery by plaintiff, is whether, having testified, without qualification, that there was no fire or flame or hot iron in the range, and that friction caused the compound to ignite, she has failed to prove that defendant's negligence was the cause of her injury. We shall assume (I think are required to assume) that the jury did not believe that the mere friction arising from spreading the enamel on iron with a brush caused the brush or the compound to ignite, and that they did believe that the brush, or vapor from the compound, reached and was ignited by a flame. It is a matter of common knowledge with those who have used gas ranges that a very small jet of burning gas, not easily observed, will sometimes be found in a burner from which the supply of gas is supposed to be completely turned off. It is true that, in the only count of the declaration under which we consider the plaintiff has the right to recover, she avers that, while putting the composition upon the range—

" In a careful, prudent, and gentle manner, with a flat bristle brush, the composition or substance suddenly ignited from the friction of spreading it and suddenly be-

came a burning flame, shooting out and up from plaintiff's gas range aforesaid."

She also avers that the compound was a highly inflammable, volatile, dangerous mixture, and avers the duty of defendant to have been not to place the substance upon the market without warning as to its dangerous character. The pleading is inartificial and loose; but in essence it avers a specific duty, a negligent breach of that duty, and, as a consequence, an injury. The averment that the flame was caused in a particular way and the testimony in support of the averment, when considered in connection with the testimony, produced by plaintiff, that the compound could not have so ignited, might well have induced a belief that plaintiff was not truthful. On the contrary, and depending upon the multitude of things which affect the judgment as to the truthfulness of a witness, the belief might be engendered that plaintiff honestly supposed there was no flame in or about the range, that the vapor ignited, and that she was truthfully describing the occurrence as it appeared to her.

Assuming there was a variance between the declaration and the proof upon the point of how ignition was caused, it is not vital. The duty of the defendant is the same, the breach of that duty, as alleged, and resulting injury to the plaintiff—matters to be proven to the satisfaction of the jury. There is no claim made, and in view of all the allegations of the declaration it cannot be supposed, that the defendant was not properly informed concerning the real issue to be tried. No defense which would have been open if the declaration had alleged that plaintiff supposed there was no flame in the stove, but that there must have been an unobserved flame which ignited the vapor or compound, was denied or abridged. Indeed, she was not bound to aver or to prove just what caused the compound to ignite if she was using it as directed and without negligence on her part. It is not claimed that plaintiff was guilty of any negligence contributing to her injury. The

point is ruled, in principle, by *McCaslin* v. *Railway Co.*, 93 Mich. 553, 556, 557 (53 N. W. 724). The case is unlike *Schindler* v. *Railway Co.*, 77 Mich. 136 (43 N. W. 911). The opinion delivered in the case last referred to contains, beginning on page 152, a discussion which is pertinent here. The court should not have directed a verdict.

The special questions proposed were inconclusive of the real issue. No error is pointed out in the charge of the court.

We have given careful consideration to the remarks made by the attorney for plaintiff, to which exceptions were taken. Many of them were extravagant. With a single exception, there appears to have been some foundation for them in the testimony. The statement: "She brings this suit, and demurrer after demurrer comes in, and twice we have gone to Lansing in regard to this matter, and now we are down here; it took all those journeys to come here, gentlemen of the jury," etc.—is one which cannot be defended. Plaintiff herself, unsuccessfully, appealed from the order sustaining the demurrer interposed by the merchant of whom the polish was purchased. It is presumed that such remarks made to a jury are made for the purpose of influencing them. The plaintiff was badly injured. She recovered a verdict for $1,500. The testimony leads to but one conclusion, and that the one which was reached. Under the circumstances, it may be and should be said that defendant was not prejudiced by the remarks of counsel.

The judgment is affirmed.

MONTGOMERY, HOOKER, MOORE, and BROOKE, JJ., concurred.